Next case please. Please remind that 416 is a marriage of Agnes Sorce, Appellant, by Julia Lassie, v. Royce Sorce, and Sorce and Appellant, seconded by Robert Wright. Ms. Lassie. May it please the court and counsel, I represent Agnes Sorce in the underlying dissolution action and the third party action, which is the reason why we're here before you today. Just to give you some background, how did this all come about? In 1985, Roy, the husband of my client, came back to Peoria, Illinois, in order to run the family-owned corporation. Start from 1985 and up through 1992, he ended up as president, chief operating officer, and was put on the board of directors. He continued in that fashion for many years, and then we get to the point in 2004 where the marital relationship breaks down. Roy works with his father at the corporation, and it is, again, solely owned by Roy, his father, and a brother who has no interest in the operation of business. When the marital problems began, Roy and his father embarked on a course of action to absolutely crush Agnes, and it was without regard to any type of collateral damage. This behavior consisted of threats that she would never get a penny. It consisted of when one of the daughters took her mother's side, the corporation sued her in small claims court. The children were humiliated in public by the grandfather. Money was cut off where she couldn't even buy a prescription for a sick child. The threats about the money came to fruition with regard to Roy's income. From 1999 through 2003, Roy's W-2 income exceeded half a million dollars a year. The parties built a million dollar house in Peoria, Illinois, and lived a lavish lifestyle. The corporation, as the trial court noted, took a deduction for the W-2 income paid to Roy and reported that as reasonable compensation for the services that he was rendering. As I said, the parties had a lavish lifestyle befitting this half million dollar income stream. The years at issue here are 2004 and 2005. And in 2004, notwithstanding that trial, Roy and his father maintained that they knew that as of that year the money would stop and he would be limited to his rental income and a $1,600 gross per week salary. They still continued to live in the million dollar home. The housekeeper who ran Roy's personal errands was paid in 2004 and up into 2005 $400 to $1,000 a week. But when the marital problems erupted, they circled the wagon and the money ceased. Roy was not given a bonus at the end of the year, as had been the pattern from 1999 through 2003. He was limited to his base salary that hadn't changed since 1992. He was performing the same services for the corporation in 2004 and 2005 that he had been in 1999 through 2003. He was still a shareholder of the corporation, a director, and the president and COO. As the court found correctly, the claims that Roy's drop in income was due to his health or his work habits were not credible. That the sole reason why the W-2 income dropped by half a million dollars per year was for the sole purpose of depriving my client of spousal support, child support, and obviously that the income would be considered a marital asset in the dissolution action. In 2004 and 2005, for the first time, as Roy's income plummeted, the corporation purchased CDs in excess of $800,000. Hence, when that was discovered, this big third party complaint was filed. The trial court correctly found that there was no legitimate or understandable business reason not to pay the bonus income and to pay him 20% of what he had been making when he was performing the same services. The trial court correctly disbelieved Roy when he claimed that his W-2 income from 1999 up through 2003 was simply a gift. Corporations don't give gifts. The trial court, though, was incorrect when it determined that it was okay for the corporation to drop his income by 80% solely... Let me answer that. I mean, don't closely held corporations give gifts? I mean, isn't that what a lot of families do is put Junior on the payroll when he couldn't get paid that kind of money anywhere else in the world anyway? I would say that, yes, in the sense of not a donative gift, that's true. But here, it was not a gift because the trial court specifically found that the story that it was a gift to buy a house could not be true because the money continued to be paid even after the house was built and the parties were living in it. And there was $375,000 sitting on the corporate books that obviously wasn't used for the house. So, specifically here, it was not a gift. And that was the trial court's finding. Again, the trial court was incorrect, though, to say that this W-2 income could be cut off, CDs purchased solely on the basis that there were marital problems and marital litigation. The income was not just a mere expectancy as has been argued. There was a pattern established that that was reasonable compensation for the services he was providing. There was no evidence that there was some drop in income or any other commercial factor that would necessitate cutting the salary. The trial court, I believe, missed the mark when it focused on the fact that Dad was the majority shareholder. Because what it glosses over is the fact that these two were acting in concert and the father's majority status as a shareholder was simply legitimizing the cutoff of the income. Roy is chargeable with this fraud by acquiescence. The cut can't be reconciled with ordinary business integrity. And certainly if you all of a sudden were earning 80% less when you're doing the same work, it would put a person not engaged in a fraudulent scheme on notice and you would make inquiries, the cases say. Can I ask you, what did Mr. Source's income and expense affidavit reflect during the pendency of the action? I mean, his income goes from $688,000 in 2002 to $91,000 in 2005. But my understanding is since he was during that time, he wasn't charged. Didn't he have to pay the $5,200 a month mortgage, $2,300 a month in child support, which alone would be more than what he said he's making? What did his income and expense affidavit say? His income and expense affidavits for those two years in question showed the basic salary, and then there was some rental income from the partnership that owns the land. But his salary was never higher than this base income of $1,600. There was also, I think, a carryover of perhaps some interest from the corporation, but it was never over, it never equaled the sums that he had been making before. Is he making enough to pay his bills under? That's an open question. In my view, the amounts that he was obligated to pay compared to the amounts he claimed he was making, there's no way that that could have happened, and pay for his expenses, the court-ordered expenses, under the income under the affidavit. In any event, the trial court wanted to focus on this expectancy, and the fact that the corporation represented for years that this was reasonable compensation indicates that as long as he was performing the same services, then he was entitled to that same income stream, absent some non-fraudulent reason to reduce it. There's been considerable focus on, well, dad had a right as a majority shareholder to take the vote, to not pay him the money. But I think the cases that we've put out in our brief show that you may have a legal right to do something, but when that act that is legal is used as a smoke screen to obtain services and not pay for them in order to harm another, that's unjust enrichment, and it cannot stand. In the Rapalalo case, the demolition case, the property owner had a right to go get a demolition permit. He didn't have a right to kind of jig the address and then take advantage of the fact that the city didn't pick up that it was a historical monument, demolish it, and then reap the benefit of not having to pay $200,000. Well, let me ask you this. I mean, your argument is that this cut in pay, in essence, was not an arm's length transaction. That's correct. Do you think that the setting of the pay originally was an arm's length transaction? In other words, was Mr. Sorce worth $600,000 to any other business in the world other than his daddy's? I don't think that that's relevant. I mean, I think it has—what is relevant is the action that was taken in cutting the income, that that was not an arm's length, and the fact that, you know, maybe he wanted to pay his son more when the sole purpose is to accept the same services, pay 20% for the only reason that you don't want your daughter-in-law to get child support and maintenance. That's unjust enrichment, regardless of whether or not he was paying him top dollar in the good years. I have a question regarding the amount of the constructive trust that you requested. You said there was $800,000 placed in corporate—CDs in the corporation's name, but yet, if I read this correctly, you're only asking for constructive trust in the amount of $106,000. How that came about was that when Mr. Sorce was behind in satisfying the court order to pay legal fees, and upon the discovery of the CDs, the attempt was made, you know, in a fee hearing setting to disgorge his percentage share of the CDs. So if he had a 22% share in the company, to get 22% that would clearly be his. You know, the corporation was owned by three people, so you have a fund, so you assume that it would be owned, you know, in accordance with the percentage shares in the company. So we tried to get his proportionate share. At trial, we attempted to amend the complaint to increase the amount, but that was denied based upon the court's judgment in favor of the defendant. As you stand here today, what amount are you requesting for constructive trust? We moved to amend the amount, and I don't have the exact dollar figure, but it would be our contention that the amount that should be placed in trust would be not only the amount that represented his share percentage, but the fact that it would represent the income that would have been paid to him, and it would be the full amount of the $800,000, would have represented and covered the full amount that would have been paid to him, absent the fraud and the marital problems. I guess my final point, absent any questions, is that the trial court elevated form over substance, and substance over form is what the court of equity has to do, and we would ask that you reverse the trial court order. Did the trial court say that he was exercising his discretion not to grant you this constructive trust, or did he say, I can't do a constructive trust? I don't believe he used the words, I'm exercising my discretion to not impose a trust. My take on his ruling, which is in the appendix, is that, well, even though I find that the cut was solely to deprive Agnes as a matter of law, I don't think I can impose a constructive trust. That's my understanding of the ruling. And last, what do you think our standard of review is on that decision? De novo. Thank you. Thank you, Mr. Glenn. Mr. Rohde. Thank you. May it please the court, Mr. Velasquez. My name is Robert Rohde, and I represent the respondent and third party defendant in this case, Source Enterprises. The plaintiff lost this case at trial because she failed to prove the allegations of her complaint. And her complaint, we've set it forth in our brief, alleged Source Enterprises concealed Roy's income through sham transactions and by fraudulently agreeing to divert his bonus money into certificates of deposit held by Source Enterprises, and that the CDs were identifiable and traceable proceeds of these sham transactions. So her complaint did not allege no bonuses were paid. The complaint alleged that the bonuses were actually, in the view of the parties, placed into these CDs and really belonged to Roy, and that their failure to be in Roy's name was simply a sham. That's different than what she's arguing now. The trial court entered express findings about what happened here, and the trial court's findings make clear she did not prove the allegations of her complaint. The trial court made express findings that Roy was an at-will employee of Source Enterprises. He had no employment contract. Roy had no right to receive any particular discretionary bonus from Source Enterprises, only a mere expectancy. That's what the trial judge said, and I believe that is a factual finding made by the trial court. There was no employment agreement. He had no right to receive a bonus, only an expectancy. The trial court specifically held Alan Source, Roy's father, as the 60% owner, controlled Source Enterprises. And there was a lot of testimony at trial about the source of Alan's control of the company. It was complete control. He controlled everything. He had 60%, correct? One brother has 20%. Yes, which Alan had gifted to both brothers many years ago. One brother lives in California, doesn't participate in the business. He owns an equal amount to the company that Roy owned. The court was also specific. It was Alan who made the decision on the bonuses that were to be awarded, and Alan made the decision not to award Roy a discretionary bonus in 2004 and 2005. The court further went on to say no certificates of deposit or other assets within Source Enterprises were being held for Roy's benefit. There was no transfer of any asset from Roy or the marriage to Source Enterprises. And so the court found this money never belonged to Roy. That's what the court found. In reality or in – there was no secret agreement, no sham. This money doesn't belong to Roy. If he didn't get it, he's never getting it. And the court – your Honor asked a question about what the court decided, whether it was exercising its discretion. And you can read the court's findings on page 8-1, the appendix of the petitioner's brief. There's a portion of the decision where the court says, I don't think it causes a constructive trust to be imposed under these circumstances. And I think it's clear a court has discretion in whether to impose a constructive trust. And I've cited the American National Bank case v. Vinson, where it makes clear that the trial court does have discretion in deciding whether or not to impose a constructive trust. And in quoting from that case, the Vinson case, the court there said, nonetheless, even if a trust were arguably appropriate, there was no abuse of discretion in refusing to impose one in this case. So I think, you know, absent some clear statement that the court felt its hands were tied in this situation, the court here needs to presume that the court was properly exercising its discretion. And I believe that statement I just read to you from the appendix of the court's decision, where he's talking about not appropriate under these circumstances, supports that. Now, I think it's also important to look at what the court did not find. The court made extensive findings here. There was no finding of any agreement between Allen and Roy to divert any money into CDs. There was no finding of any agreement between Allen and Roy that this money was being parked here and would be available to Roy at some time in the future. There was no finding of any sham transactions. The court ruled Roy, in fact, received no bonus. Now, in terms of the constructive trust law, I'd like to visit that for a few minutes. The plaintiff likes to cite cases about, well, you know, the court can impose a constructive trust any time that it sees injustice and things like that.  But the courts, and particularly the Illinois Supreme Court, has made clear that a claim for constructive trust is not just some ambiguous claim that morphs into whatever a plaintiff wants it to be. The courts have placed clear limits on the circumstances when a constructive trust can be imposed. First, the Supreme Court's Suttles v. Vogel case makes clear a plaintiff must allege and prove wrongdoing by the defendant. Here the defendant is Source Enterprises. And the court says wrongdoing such as fraud, breach of fiduciary duty, duress, coercion, or mistake in the Suttles case is a case where the court found the complaint did not state a cause of action for constructive trust. Further, a plaintiff must show that the plaintiff has a vested interest in the property over which a constructive trust is sought. You can't go out and just claim something's unfair, I should have this money out here, or I should have this asset. You've got to show some vested interest in that asset. Third, the plaintiff, and this is the Supreme Court's recent... Do you have a vested interest in an expectancy? No, I don't believe so. And that is, you know, here she's wanting to bring this property into the marital estate. And the court held that Roy had no right to a bonus, it was just an expectancy. And I've cited the Weinstein case, the marriage of Weinstein, where the court there finds an expectancy is not marital property. It says, this is quoting from Weinstein, in order to be property within the ambient of the act, and we're talking about the Marriage and Dissolution of Marriage Act, the rest must be in the nature of a present property interest rather than a mere expectancy interest. An expectancy interest is the interest of a person who merely foresees he might receive a future beneficence. That's all Roy had in a bonus. He hoped he would receive a bonus. Well, not directly on the point, but kind of analogous. In a normal situation where somebody's not, say, employed by a family company, I mean, a trial, and somebody who voluntarily, if a court, or if a trial court finds somebody who comes voluntarily underemployed in order to punish his wife or children or whoever thinks they've done him wrong, the court can say, go get yourself properly employed up to your feet, or I'm going to put you in jail. Right. And that would be an action against the spouse. Here, that's not what we're talking about here. She's going out trying to reach out to a third party. Source Enterprises is a separate entity, and she's trying to reach out there and say those assets in Source Enterprises are marital assets. And so she's got to show some wrongdoing by Source Enterprises, and that she or Roy have a vested interest in that money. Did the court make any factual findings about why the bonus was cut? I disagree with what she said. She said that the court said the bonus was cut solely because, you know, to deprive Agnes of marital rights. He doesn't say that. I understand you'll disagree about that, but do you remember did the court make any findings in that regard? He said, as I recall, something to the effect, the court found, but for the divorce, the court believed there would have been a substantial bonus paid to Roy in 2004 and 2005. I do think that the evidence to me was clear that Alan Source, when he knew that the relationship was rocky, and I think he knew it at the end of 2004 and certainly knew it by January of 2005, that he made a calculated decision that he was very upset that there was another man in Agnes' life, felt that you don't want to be a member of our family, that I'm going to do what I can to limit what's available for you. I have no doubt if she had minor children, I think that Roy's salary would have probably been reduced to subsistence level for Roy. Right. That's what he said. And now my response to that is that if you look at the Supreme – this is Alan Source. He's not married to Agnes. Agnes didn't marry him. Agnes didn't marry the company. The issue here is whether Roy had a right to compel Source Enterprises to pay him any money because an employee – the Supreme Court's at-will employment doctrine says that an at-will employee can be terminated for any reason or no reason at all, and there are very few exceptions to that. There's only a couple of instances where they have said retaliatory discharge in certain situations, like for retaliation for filing a workers' compensation claim. That's an exception to the at-will employment doctrine. The Supreme Court's Zimmerman case, I think, is very important here. That's a case where a woman sued her employee for reducing her hours and income in retaliation for her exercising her rights under the Workers' Compensation Act. The Zimmerman court goes through the at-will employment doctrine, says there are a couple of exceptions for retaliatory discharge, says you weren't discharged, there's no claim here, and her complaint gets dismissed. So what that case tells you is an employer can reduce an employee's pay for any reason or no reason at all. There's no such thing as an improper reason. The question here is was there a true reduction in pay. That's right, and the court held there was. The court held there was. And that's why she had to prove the allegations of her complaint that this was all a sham. Well, I sort of live my life by actions speak louder than words. And here we have somebody whose income was cut by 80% who doesn't walk away from the company that cut his salary. And so isn't that – doesn't that show that he's got a present property interest in those bonuses contingent on only this divorce being finalized? No, the trial court certainly did not. Why would he stay under these circumstances? Probably because he can't earn more money anywhere else. Has he looked for other employment? He still – I don't know. There was no testimony about that. As a member of the board of directors, even though only holding a 20% interest, did he ever request a meeting of the board, ever request a vote on whether or not this – these were fair and legitimate reductions? No, there was no testimony to that effect. There was no testimony about that. Well, the plaintiff in this case presented no expert testimony that Roy is not being reasonably paid at 90-plus thousand dollars a year plus a car plus health insurance. They presented no expert testimony that he could receive more money if he was working somewhere else in a similar capacity. So there was no evidence that – well, there was – the trial court certainly didn't find that Roy was being underpaid in 2004 or 2005. Let me – as far as the – you know, you talked about the workers' comp cases and what have you, but are the case laws – they talk about looking at these closely-held corporations and some of these transactions, looking at them slightly differently than you look at what would otherwise be an arm's-length transaction. In other words, recognize that it rarely are these arm's-length transactions. Not in the employment context and not anytime that an employee has gone out and gotten something from a company or something else. It's because it was a sham. It wasn't a real transaction, and there's no findings here. In the passage you just read, Allen made a calculated decision, and he's not only depriving Agnes, he's depriving Roy. And there was no testimony about anything like that and certainly no findings. I guess that – and maybe you don't know the answer, but it seems that suddenly his expenses far exceed his income, yet I didn't see any allegation that he wasn't paying his bills. So how does that happen? Well, Roy continues to get income from sources other than his wages. The building is owned by a partnership. He owns a portion of that. The corporation pays rent to the partnership. He receives money from the partnership. So his income, his access to money is not simply his W-2 compensation. And so there was no evidence that Roy isn't paying his bills as they come due. I have gone through in our brief and cited specifically three Supreme Court cases. One is the Zimmerman case, which talks about employment at will and that you can reduce an employee's pay for any reason or no reason at all. The second Supreme Court case that I think is very important is the Eichner case. That's a constructive trust case. The court makes clear that a party must not only, in showing wrongdoing, they must show a specifically identifiable and traceable asset that is the race of the trust. And here, there's no findings about that, and the plaintiff did not do that. I mean, your question about the amount of the bonus is one that the trial judge never did understand what the amount of the bonus would be. And he asked the plaintiff's attorney at times about that and really got no help. I've cited that in our brief. The third case is the Hoffman case, which is a case, it's a marital dissolution case about an issue over a farm. And there, the Supreme Court said, let me find that here. It says, we must therefore determine whether Roger's forfeiture of the farm was in fact a fraud on his wife's marital property as measured by whether it was intended collusively with intent to regain the property. That's the test. And that's what she had to show. And the trial court held she failed to show it. The trial court's findings are not against the manifest way of the evidence, and we ask that the decision be affirmed. Thank you. Thank you, Mr. Rohde. Ms. Galassi, some rebuttal? Mr. Bitt, Your Honor, a couple points Mr. Rohde brought up had to do with there's no expectancy. I point you to the Humphrey case, and that's the ambulance case. When the husband sells off his ambulance business, it didn't stop the court from imposing a constructive trust on the income from the business, even though it was titled in someone else's name. Mr. Rohde also brought up, well, it was Allen's decision, Allen's decision. Again, I think the court was misfocused in that if you look at the Hoffman case, the Supreme Court case, the parents, when they foreclosed on the farm, they 100% made that decision to foreclose on the farm and take it back from the son. But that didn't stop the court from saying that these parties were acting together, and the court imposed a constructive trust. Let me ask you a question. Let's suppose, hypothetically, that during the course of a marriage, the father-in-law says, I'm going to give my son and his family $500,000 a year as a gift. And he just gives it year one, he gives it year two, he gives it year five. And then year six, he sees a divorce in the wind or something like that, and he says, no $500,000 this year. Can you force the gift? I don't believe so if it is a gift, but I think you have to recognize the trial court specifically found that the bonus money being paid to him all those years was not a gift. So your question, yes, but it doesn't apply here. Okay, so we have a specific factual finding that it's not a gift. And you asked about what Roy, what action did he take. The testimony was that when Roy said, oh, I'm doing better at work, and he was questioned, well, did you go ask your dad for a raise since you're doing better? Nope. Did you ever question your dad about the income loss? Nope, I never questioned him. He never did anything. And his silence is deafening. And to me, it points to exactly what was going on between the father and the son to defraud the marital estate here. Shouldn't then some of your action really be through the marital action and directed at Roy for, you know, a voluntary reduction in his income, allowing daddy to keep this money and, you know, being in control of it and doing these things? I mean, isn't what Mr. Rohde said correct, that most of this really belongs within the marriage case itself? I think that the fact that I have a remedy to go into the, you know, the family court and say, this guy, you know, deliberately is reducing his income with dad's help, impute the income and impose obligations. But that doesn't get me the money from my client when he continues to work, you know, for 20% of what he used to make. And the fact that I do have that remedy, I don't think precludes, you know, the imposition of a constructive trust in an equity action. Tell me what the effect of a constructive trust is. Does it mean your client gets the money or does it just freeze it for later determination? I think what, because the family case is still ongoing, that if a trust were imposed, then that would be considered a marital asset. And then it would be, you know, subject to division or allocation in the divorce matter. Well, without a constructive trust, couldn't, you know, if the guy's voluntarily, assuming the court finds that, in essence, because of collusion with his dad, that he's voluntarily underemployed. And assuming he makes the finding that whatever he was getting paid was reasonable and that it was income and not just dad's beneficence. Couldn't the judge say, look, here's what you're going to pay a month to your wife and to your, you know, for child support or whatever. And he says, I can't do that on 176 or whatever. He says, well, you make more than that. So if you don't pay it, you and your dad work it out, because if you don't pay it, I'm putting you in jail. How's that? And you're going to stay there until the money comes. You can do that, can't you? You sure can. But I don't think that I should be limited to that remedy that I'm forced to attempt to put him in jail and have him sit in jail. You think you'll sit there very long? I don't know. The other thing is, on a construction trust, there's got to be a specific race that you can point to and say, that's my money or that's this money. And I guess what is this? What's the dollar amount? What's the dollar amount of this? Well, what was identifiable to us was the connection between the corporation had never purchased CDs, and then the income plummets, and then the CDs are purchased. But in our brief, if you look at, you know, there has to be a specific rest. When, like the demolition case, well, there wasn't any. The historic home was torn down. So what's the rest? Well, the rest was the savings that the person achieved by getting this house demolished. Or the Cook County case, well, they're rigging things with city officials. Well, what's the rest? The rest is the bribes that the officials received. I don't think that, you know, like I say, that you have to – I have to point to this dollar bill with these serial numbers and match it up in the corporate coffers to find that there is a rest, you know, for which you can impose a constructive trust. Thank you. Thank you, Ms. Galassi. Thank you both for your arguments here today. The matter will be taken under advisement and written disposition will be issued in due course.